SBK:WMP
F. #2009R00600

**M-09-308**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

EDWARD T. STEIN,

        Defendant.

- - - - - - - - - - - - - - - - - - - X

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF ARREST WARRANT

(18 U.S.C. § 1343)

EASTERN DISTRICT OF NEW YORK, SS:

    MICHAEL BURGWALD, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

    Upon information and belief, there is probable cause to believe that in or about and between May 2008 and March 2009, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant EDWARD T. STEIN, having devised a scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, did knowingly and willfully cause to be transmitted by means of wires in interstate commerce writings, signs, signals

and pictures for the purpose of executing such scheme and artifice.

(Title 18, United States Code, Section 1343).

The source of your deponent's information and the grounds for his belief are as follows:

I. <u>Background</u>

1. I have been a Special Agent with the FBI for approximately 3 years. The facts set forth in this affidavit are based on my personal knowledge, as well as information obtained from the review of documents and statements made to me by witnesses with knowledge of the relevant facts. In the portions of this affidavit that describe the contents of documents or statements of witnesses, they are reported in substance and in part, unless otherwise indicated. Because I submit this affidavit for the limited purpose of establishing probable cause to arrest the defendant, I have not set forth all facts known to me about this investigation and case.

2. Since approximately March 2009, the FBI has been conducting an investigation of an investment fraud scheme believed to be headed by the defendant EDWARD T. STEIN. As discussed in more detail below, there is probable cause to believe that the defendant induced an individual identified herein as "the Victim" to provide him with a substantial sum of

money based on the defendant's false representations that he would make certain investments on his/her behalf, when, in fact, he did not make these investments but instead used the money provided by the Victim for other unauthorized purposes.

II. Interview of the Victim

3. During an interview, the Victim stated that in or about 2008 he/she inherited a substantial sum of money as a result of the deaths of both of his/her parents. The Victim stated that he/she was looking for someone to oversee his/her investment of his/her money and asked the defendant to help him/her in this regard. The Victim believed that the defendant was a financial advisor. The Victim stated that in a meeting that occurred around in or about April 2008 in New York, the defendant agreed to present investment opportunities to the Victim concerning the money that the Victim inherited from his/her parents.

4. The Victim advised that, in or about May 2008, he/she directed the defendant to invest a total of $3 million in annuity accounts. The Victim stated that to accomplish this goal, he/she sent a total of $3 million in three wire transfers of $1 million each from one of his/her bank accounts to bank accounts controlled by the defendant. The Victim stated that based on the defendant's representations, he/she expected that

the defendant would invest this money on his/her behalf in annuities. The Victim stated that the defendant informed him/her that he invested $1 million each in three separate annuity accounts with three different investment companies, MassMutual, MetLife and a subsidiary of New York Life. The Victim stated that during the last several months he/she has requested that the defendant provide him/her with documentation from the three investment companies showing his/her accounts with these companies. The Victim also stated that his/her attorney (the "Attorney") also requested that the defendant provide this documentation. The Victim further advised that, to date, the defendant has not provided any such documentation and that he/she believes that these investments were not made on his/her behalf.

5.   In addition to the $3 million investment described above, the Victim advised that in or about June 2008, he/she transferred $2 million to the defendant to hold pending his/her decision of whether to invest the money in Counsel Financial Services LLC ("Counsel"), a firm that raises money to loan to law firms to finance litigation. The Victim had previously invested $500,000 in Counsel through the defendant. In October 2008, upon returning from an overseas trip, the Victim directed the defendant to invest the $2 million in Counsel. However, the

4

Victim stated that he/she learned in or about March 2009 that the $2 million was never invested in Counsel.

6. The Victim stated that he/she also learned that there were at least seven unauthorized wire transfers from his/her account at Ameritrade Advisors between December 2008 and March 2009. The Victim provided a copy of these wire authorizations to the government. These documents show that (1) on December 19, 2008, Ameritrade Advisors received a letter authorizing it to wire $350,000 from the Victim's account to an attorney IOLA account belonging to Frankfurt Kurnit Klein & Selz, PC; (2) on December 30, 2008, Ameritrade Advisors received a letter authorizing it to wire $100,000 from the Victim's account to a Washington Mutual bank account registered to Vibrant Capital Corporation (the "Vibrant WaMu Account") at the defendant's business address; (3) on December 30, 2008, Ameritrade Advisors received a letter authorizing it to wire $100,000 from the Victim's account to an HSBC bank account registered to Vibrant Capital Corporation (the "Vibrant HSBC Account") at the defendant's business address; (4) on January 5, 2009, Ameritrade Advisors received a letter authorizing it to wire $250,000 from the Victim's account to a JPMorganChase account registered to an individual (the "Individual"); (5) on February 4, 2009, Ameritrade Advisors received a letter authorizing it to wire

$500,000 from the Victim's account to a TD Bank account registered to G&C Partnership Joint Venture at the defendant's business address; (6) on February 10, 2009, Ameritrade Advisors received a letter authorizing it to wire $252,000 from the Victim's account to the Vibrant HSBC Account; and (7) on March 5, 2009, Ameritrade Advisors received a letter authorizing it to wire $100,000 from the Victim's account to a TD Bank account registered to G&C Partnership Joint Venture at the defendant's business address. The Victim stated that prior to seeing the wire authorizations, he/she had no idea about the workings of Vibrant Capital Corporation and had never heard of Frankfurt Kurnit Klein & Selz, PC, or the Individual. The Victim further advised that while he/she and his/her mother had a company called G&C Investment, which was opened in Maryland, he/she had never heard of G&C Partnership Joint Venture located at the defendant's business address in Roslyn, New York. The Victim further stated that although his/her signature appears on each of these wire authorizations, he/she did not sign any of them.

III. Interview of the Attorney

7.   The FBI also interviewed the Attorney about his conversations with the defendant. During this interview, the Attorney stated that during a meeting in or about May 2008 with the Victim and the defendant, the Attorney recommended that the

6

Victim invest a portion of the money that he/she inherited in annuities. The Attorney further stated that during that same meeting the Victim asked the defendant to determine the companies through which he/she should buy the annuities. The Attorney further stated that, in later meetings and conversations, the defendant stated on several occasions that he invested $3 million of the Victim's money in annuities on his/her behalf. The Attorney further stated that he has made several requests from the defendant to send him documents reflecting the investments in the annuities, but, to date, the defendant has not provided any such documentation.

        8.    The Attorney further stated that he spoke to the defendant again about the annuities on or about March 23, 2009. The Attorney stated that, during that conversation, he requested that the defendant immediately send the annuity contracts that reflected the investments on the Victim's behalf. The Attorney stated that the defendant told him that he would send them the following day. The Attorney also stated that he asked the defendant to identify the investment companies that he used to purchase the annuities. The Attorney stated that the defendant advised him that he purchased the annuities with three separate companies, which the defendant identified. The Attorney advised that following this call, he contacted two of these three

companies for the purpose of verifying that the Victim owned an annuity with those companies. The Attorney advised that he gave both companies the Victim's social security number and was told by both companies that the Victim did not own an annuity with that company.

IV. Documents Corroborating the Victim's and Attorney's Statements

9. The FBI has obtained certain bank records relating to bank accounts controlled by the defendant. These records reflect that: (1) on May 6, 2008, the Victim sent $1 million by wire transfer to a bank account controlled by the defendant; (2) on June 3, 2008, the Victim sent $1 million by wire transfer to a bank account controlled by the defendant; and (3) on June 18, 2008, the Victim sent $1 million by wire transfer to a bank account controlled by the defendant. Each of the three bank accounts were registered to the defendant's business address in Roslyn, New York, within the Eastern District of New York. In addition, although the bank records obtained thus far are not complete, the May 2008 bank statement for the bank account that received the May 6, 2008 wire shows that at least a significant portion of the $1 million that the Victim wire transferred into that account was not sent to an entity that provides financial service products such as annuities. Specifically, this bank

statement shows that a total of approximately $150,000 was transferred to the defendant's personal accounts at Bear Stearns and at Washington Mutual. The bank statement also shows that at least several hundred thousand dollars was wired to bank accounts registered to other individuals believed to be investors in funds controlled by the defendant.

10. I have also received a copy of the seven wire transfer authorizations from the Victim's Ameritrade account that the Victim stated were unauthorized. Based on my review of the signature on the wire authorizations, all seven signatures appear to me to be identical and I believe that all seven signatures are copies of the same signature. In addition, I have obtained certain bank records from the Vibrant WaMu Account and the Vibrant HSBC Account, which reflect that these accounts are controlled by the defendant. In addition, I have obtained records reflecting that the Individual provided money to the defendant for the purpose of investing in "Gemini Fund I LP," an investment fund purportedly created by the defendant. I have also learned that Frankfurt Kurnit Klein & Selz, PC, is a law firm that has provided legal services to the defendant.

WHEREFORE, your deponent respectfully requests that a warrant be issued for the arrest of the defendant EDWARD T. STEIN so that he may be dealt with according to law. Your deponent

9

also requests that this affidavit and the arrest warrant for the defendant be sealed, except that the FBI may disclose this affidavit and the arrest warrant as necessary to effectuate the arrest and arraignment of the defendant.

_____
MICHAEL BURGWALD
Special Agent
Federal Bureau of Investigation

Sworn to before me this
31st day of March, 2009

HONO
UNIT    S/Mann    JUDGE
EAST              YORK